UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE
APR 10 8 45 AM '01
US DISTRICT COURT
DISTRICT OF MASS

**ANDREA C. DOW,**
Plaintiff,

v.

**GEORGE E. DONOVAN, ET AL.,**
as partners of
**LYNE, WOODWORTH AND EVARTS, LLP,**
Defendants.

Civil Action No. 00-11655 REK

**FIRST AMENDED COMPLAINT FOR TRIAL BY JURY**

1. Pursuant to the order of the Massachusetts Commission Against Discrimination (dated March 27, 2000), attached as Exhibit A, plaintiff Andrea C. Dow, Esq., evokes the jurisdiction of this Court for a jury trial on her sex discrimination complaint against Lyne, Woodworth and Evarts, LLP and her derivative complaints against the partners under M.G.L. c. 108A, § 15(3). This is a case about a law firm with a glass ceiling for women lawyers, an artificial barrier created by the gender-biased attitudes of its partners, its double standard for male and female attorneys and its male-dominated firm culture. This gender bias affected how the firm trained and evaluated Dow, and, ultimately, motivated the firm's decision to deny her partnership.

**The Parties**

2. Plaintiff Andrea C. Dow ("Dow") is an attorney practicing in Boston, Massachusetts. From 1989 until 1997, Lyne, Woodworth & Evarts, LLP ("LW&E" or "the defendant law firm"), employed Dow as an associate.

40

3. George E. Donovan ("Donovan") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Donovan was a partner at LW&E.

4. Joseph F. Ryan ("Ryan") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Ryan was a partner at LW&E.

5. Edward P. McPartlin ("McPartlin") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, McPartlin was a partner at LW&E.

6. Walter J. Connelly ("Connelly") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Connelly was a partner at LW&E.

7. Norman M. Goldberg ("Goldberg") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Goldberg was a partner at LW&E.

8. Frances X. Hogan ("Hogan") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Hogan was a partner at LW&E.

9. Edward S. Rooney ("Rooney") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Rooney was a partner at LW&E.

10. Norman C. Sabbey ("Sabbey") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Sabbey was a partner at LW&E.

11. John P. Carr ("Carr") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Carr was a partner at LW&E.

12. Kenneth A. Johnson ("Johnson") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Johnson was a partner at LW&E.

13. Domenic P. Aiello ("Aiello") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Aiello was a partner at LW&E.

14. Joseph H. Skerry, III ("Skerry") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Skerry was a partner at LW&E.

15. Stephen T. Kunian ("Kunian") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Kunian was a partner at LW&E.

16. Joshua J. Vernaglia, Jr. ("Vernaglia") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Vernaglia was a partner at LW&E.

17. Michael J. Owens ("Owens") is an attorney practicing in Boston, Massachusetts. At all times relevant to this action, Owens was a partner at LW&E.

**Jurisdiction**

18. This action based on a federal statute, Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 2000e et seq. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(4) and 42 U.S.C. § 2000e-(5).

19. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the plaintiff's state law discrimination claim because it arises out of her Title VII claim.

**Procedural History**

20. All administrative prerequisites to a judicial determination have been met as the claim was timely filed at the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Opportunity Commission ("EEOC") on July 11, 1997.

21. On March 13, 1998, the MCAD issued a probable cause determination. Over the course of the next year, the parties engaged in post-determination discovery.

22. On August 18, 1999, pursuant to its new procedural regulations, the MCAD held a conference prior to certifying the case to a public hearing. At the

conference, LW&E reserved its right to a trial by jury under *Lavelle v. MCAD*, 426 Mass. 332 (1997). The presiding Commissioner proposed a pre-hearing dismissal pursuant to 804 CMR 1.20(5)(d)1 to obtain a jury trial in the first instance and requested briefs on the proposed action.

23. By Order dated March 27, 2000, the Commissioner dismissed the MCAD case so that the case could proceed to final factual adjudication in court.

24. Plaintiff's Title VII claim is timely filed as it was filed within 90 days of receipt of a right to sue letter from the EEOC, attached as Exhibit B. See 42 U.S.C § 2000e-(5).

25. Plaintiff's Chapter 151B § 9 claim is subject to equitable tolling from September 7, 1999, the date upon which the MCAD took the parties' position on pre-hearing dismissal for a jury trial under advisement, to March 29, 2000, the date plaintiff received notice of the dismissal order.

**Factual Allegations**

26. LW&E is a law firm founded in 1912. The firm specializes in the areas of insurance defense, real estate, personal injury, tax and estate, probate and family law.

27. During all times relevant to this Complaint, LW&E had between 12 and 16 partners, all of whom were men save one: Francis ("Fran") Hogan, admitted to the partnership in 1977. As the only female partner in the history of LW&E, Hogan assumed a role not uncommon to individuals with sole minority status in an organization: she ratified the status quo and did not promote the advancement of women at the firm.

28. The firm hired Dow in 1988 while she was a third year law student. Dow was well qualified to practice law. She was a member of the Law Review at American

University Law School and had graduated with honors from Tufts University. Dow started as an associate at the firm in September of 1989.

29. From the beginning of her employment, the atmosphere at the firm suggested that woman attorneys were not regarded as the professional equals of male attorneys. For instance, when Dow first joined the firm, associates were expected to address male partners as "Mr.," yet were permitted to address the sole female partner as "Fran." Male senior associates were permitted to delegate work to directly to female junior associates, but female senior associates did not have the same prerogative. At least one male associate openly used female associates to perform secretarial tasks, messenger services and run personal errands for him. A partner (now retired) confused Dow for a secretary after she had been at the firm for several years.

30. Dow was encouraged by certain partners to conform to stereotypical feminine behavior. John Carr told her not to be "aggressive" and not to "act like a man" and Rod Connelly advised her to be "more ladylike." Likewise, Tracey Craig, also an ambitious female associate, was advised by other partners not to be "bold and aggressive."

31. Having initially rotated in different practice areas, by early 1991 Dow concentrated in litigation. George Donovan, the second most senior partner in the firm, whose practice included litigation and probate, unofficially headed the litigation department.

32. Donovan worked closely with male litigation and probate associates, providing them with an extraordinary level of legal training, professional development, and relationship building. By contrast, Donovan did not mentor and rarely ever worked

with the firm's female litigation and probate associates, including Dow, Tracey Craig, Bess Gorman, and Mary Ryan. Dow's occasional work for Donovan was limited to small matters or pro bono cases.

33. Donovan's lack of interest in female associates, including Dow, deprived her of equal opportunity for professional growth and development. Donovan mentored and sponsored the partnership of all four male litigation/probate associates, who were made partner in the ten year period proceeding Dow's rejection: Ken Johnson, John Carr, Dom Aiello and Jay Skerry.

34. Dow received most of her litigation assignments from two senior litigation partners, Ed Rooney and Joe Ryan. Dow worked independently on Rooney and Ryan's cases, handled some large cases and was allowed to try cases in court and in arbitration. Although she was considered a litigation associate, she was willing to take on cases in areas where no partner had a particular expertise, including bankruptcy, divorce and employment law. As a result, Dow had a broader range of experience then other associates.

35. As Dow developed into a senior associate, she appeared, by all objective measures, to be doing well at the firm. She consistently received annual raises (a mark of approval not granted to all associates). Her verbal reviews in connection with salary increases, while including an assessment of strengths and areas for improvement, were generally positive in tone and nature. She was also unique among associates in her marketing savvy and initiative and she was responsible for bringing lucrative business into the firm. In the summer of 1995, Jay Skerry, a litigation partner, told her during her review that she was "one of the best natural advocates the firm had ever seen."

36. Although denied the opportunity to work in groups on the large litigation cases handled by Donovan, Dow enjoyed her work at the firm, particularly because of the close professional relationship she enjoyed with Rooney, whom she considered her mentor. She also considered Rooney a friend, as they regularly discussed areas of common interest. Rooney treated Dow more like a partner then an associate by confiding in her about confidential partnership matters and sharing his opinion of his partners. During the summer of 1995, as Dow was entering her seventh year with the firm, Rooney told Dow that she was "partnership material" and had a future with the firm.

37. LW&E formally considered associates for partnership after eight years, although the partners were conscious of associate partnership potential well before that point.

38. In the summer of 1996, as Dow was entering her eighth year with the firm, McPartlin, a partner with whom she had minimal contact, did her review. Although the review was positive, Dow was frustrated that McPartlin gave her a vague answer when she asked where she stood on partnership track.

39. Immediately following her review, Dow asked Rooney whether she still had a future with the firm or should leave. Rooney urged her to stay, reiterating his belief that she was "partnership material." He discussed economic problems the firm was having and promised her a status update in three months. Rooney then made a comment to the effect that not all the partners were on Dow's side. When Dow asked who her detractors were, Rooney named John Carr. Dow expressed surprise, as she had had virtually no dealings with him since her first year. Rooney responded that Carr "has a hard time with women attorneys," that he "sees women as secretaries or housewives" and

that he was "intimidated" by Dow. They also discussed Fran Hogan, though more in the context of Dow finding it frustrating to work with Hogan than Hogan having a problem with Dow. Rooney was sympathetic to Dow's difficulties working with Hogan, telling her other associates shared her view. As the meeting ended, Rooney told Dow of a comment that Hogan made at the last partners' meeting to the effect that the firm would "end up at the MCAD" unless they made a woman partner soon.

40. The notes of a partnership meeting just prior to this conversation are consistent with what Rooney told Dow about her partnership potential. At that point, the partners, including those who had previously been critical of Dow, were generally supportive or at least open to her becoming a partner, with one exception: John Carr.

41. Dow was not surprised by Rooney's comments about Carr's attitude about women attorneys. Carr's reputation as a sexist was well known within the firm. He regularly told sexually explicit jokes and insisted on displaying a Sports Illustrated swimsuit calendar in his office despite numerous complaints from female attorneys and staff over the years. (He finally agreed to remove it after Dow filed her charge of discrimination.) Carr himself used the term "male chauvinist" in an affidavit filed in this litigation to describe how he thought Dow perceived him.

42. Dow left the conversation with Rooney encouraged about her partnership potential. She counted on Rooney to ensure that sexist attitudes did not interfere with her evaluation.

43. Meanwhile, Dow worked hard during the summer and fall of 1996 and her caseload substantially increased with the arrival of three new partners, formerly of Cuddy Bixby, in September.

44. Unbeknownst to Dow, after Rooney informed the partners that she was pressing for a decision on her partnership, their attitudes about her abruptly changed. With the issue of her partnership now squarely before them, all previous support for her evaporated and the previously open minds closed. When associate performance/ partnership potential were formally discussed in a partnership meeting later that year, all partners were extremely negative and critical of Dow and no one spoke in favor of her becoming a partner.

45. The partners' extreme negative view of Dow's partnership qualifications were not based in fact, but rooted in the culture of gender bias which permeated the firm. The partnership did not view woman lawyers as the professional equals of male attorneys and simply did not view women as "partnership material."

46. Specifically in Dow's case, partner comments about her reveal that the partnership reacted to her based on her gender rather than her professional status. For instance, partners commonly cited Dow's "good appearance" and her being "well-dressed" as her strengths. Other partners discussed Dow in sexual terms. For instance, Carr vocalized his belief that Dow was having sex with Rooney even though close relationships between male partners and associates (e.g., Donovan and the males he mentored) were encouraged and not questioned. Another partner (Aiello) referred to Dow as "hot" and discussed his desire to "spank her." Partners felt free to comment on her body and clothing as evidenced by a lengthy conversation which occurred on one occasion among a group of partners, including Fran Hogan, about whether Dow's nipples were showing.

47. Meanwhile, three months came and went from Dow's July conversation with Rooney with no further discussion of her partnership status. Rooney was avoiding her.

48. Once Rooney found himself in the untenable position of continuing to support Dow's partnership in the face of overwhelming opposition from his partners, he withdrew his support for Dow.

49. On Monday, January 13, 1997, at the urging of new partner Josh Vernaglia, Dow spoke to Rooney about her frustration about her status. She expressed her interest in receiving credit for the cases that she brought into the firm if she was not going to be made a partner in the immediate future. To Dow's surprise, Rooney was hostile towards her. He accused her of not being "a team player," citing three minor incidents, all of which had occurred after their July partnership discussion and none of which had been previously brought to her attention. Dow replied that his criticisms were unfounded and that it felt like a "set up." Rooney said something to the effect that "things were not working out" and the meeting ended without a resolution.

50. On February 5, 1997, Vernaglia informed Dow that the partners had decided on a "parting of the ways" and she would be given three months to find another job. The decision of the partners had been unanimous – all of the partners had voted to deny Dow partnership. On February 13, 1997, Dow received a memorandum confirming her departure from the firm no later than May 13, 1997.

51. After receiving notice of her termination, Dow told several partners she thought that the firm did not want to make her a partner because of her gender.

52. Anticipating that Dow would sue the firm, the partners attempted to try to discredit her by accusing her of wrongdoing in her remaining days. In March, the firm's billing system reflected Dow's write-down of some of her time on one of her contingency fee cases, a case the partners expected to go with her. They planned to -- and did -- distort the disclosed edits to a draft bill into a "theft" accusation solely for the purpose of gaining some perceived advantage in Dow's anticipated lawsuit. Contrary to the partners' characterization of the event, they neither asked Dow to immediately leave (as they did with another departing associate whom they believed to have engaged in misconduct while still at the firm) nor did they take any disciplinary action against her in the month she remained at the firm.

53. Dow left LW&E on April 7, 1997. In a letter to the partnership, she reiterated her belief that she had been discriminated against on account of her gender.

54. The decision to deny Dow partnership occurred in the context of a long history of gender disparities at the firm, including the fact that only one woman had been admitted to the partnership in the firm's nearly almost 90 year history – a full two decades before Dow's rejection.

55. Firm data between 1977 and 1997 reveals that 90% of the associates considered formally for partnership were male, despite the fact that women comprised nearly 40% of the associate pool.

56. Female associates typically did not last long enough at LW&E to be considered for partnership. Between 1977 and 1997, 13 female associates either left the firm or were fired prior to partnership consideration. At least two female associates who left in the years proceeding Dow's termination, Bess Gorman (who resigned in 1994) and

Tracey Craig (who resigned in 1997), cited the lack of opportunity for women at the firm as a reason for their leaving and others privately shared that view as well. The senior female associate fired for alleged lack of work in 1994, Mary Ryan, complained about gender and age discrimination at the firm.

57. The only two women associates who remained at the firm long enough to be considered for partnership were both rejected: Anne Dowd (1991) and Dow (1997).

58. By contrast, two of three male associates considered for partnership during Dow's tenure were admitted, Dom Aiello (1991) and Jay Skerry (1992). Even the male associate denied partnership during this period had far more support for his candidacy then Dow had (and received support from Donovan) notwithstanding recognized serious performance problems on his part.

59. Anne Dowd was as qualified for partnership as Dom Aiello. Both of them were considered in 1991. Both candidates had very similar strengths and weaknesses, yet Aiello, a man, received unanimous support, while Dowd, a woman, was rejected.

60. Dow was as qualified for partnership in 1997 as the males elected in 1991 (Dom Aiello) and 1992 (Jay Skerry). The perceived strengths and weaknesses of Dow, while different from those of Dom Aiello and Jay Skerry, were equally balanced. As compared to Aieillo, Dow had strong communication, advocacy, and client relation and business development skills, skills Aiello lacked, while Aieillo's legal scholarship was perceived as superior to Dow's. As compared to Skerry, Dow possessed considerably more trial experience and a greater ability to generate business, while Skerry was perceived as a harder worker. Like Dow, Skerry was not praised for superior legal scholarship, yet that perception was stated as a basis for rejecting Dow but did not affect

Skerry's admission. Yet, while all three had the same balance of strengths and weaknesses, both men enjoyed unanimous support, while Dow was unanimously rejected.

61. After leaving LW&E, Dow set up her own legal practice. Although most of the clients she had when she left LW&E chose to go with her, she initially suffered a significant loss of income. Since then, in order to earn compensation comparable to that which she could have reasonably expected to earn as a partner at LW&E, she has to work many more hours. Other economic losses incurred by Dow include lost benefits, lost job security and damage to professional reputation.

62. Dow has also suffered emotional distress attendant to having been the victim of discrimination.

63. Dow is entitled to recover punitive damages because the partners were consciously aware that women have historically been excluded from partnership at the firm and, at the very least, were recklessly indifferent to the equal opportunity rights of female attorneys practicing at the firm.

**COUNT I**
**SEX DISCRIMINATION (Title VII)**
**Against Lyne, Woodworth, & Evarts, LLP**

64. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64, as though fully set forth herein.

65. By the above-described conduct, the defendant law firm has discriminated against plaintiff because of her sex in the terms, conditions and privileges of her employment in violation of Title VII, 42 U.S.C. § 2000e-(5).

66. As a result of the firm's unlawful conduct, plaintiff has suffered economic damages and emotional distress.

**COUNT II**
**SEX DISCRIMINATION (Chapter 151B)**
**Against Lyne, Woodworth, & Evarts, LLP**

67. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 66, as though fully set forth herein.

68. By the above-described conduct, the defendant law firm has discriminated against plaintiff because of her sex in the terms, conditions and privileges of her employment in violation of M.G.L. c. 151B.

69. As a result of the firm's unlawful conduct, plaintiff has suffered economic damages and emotional distress.

**COUNT III**
**LIABILITY FOR PARTNERSHIP WRONGS (Chapter 108A, § 15(3))**
**Against Donovan, Ryan, McPartlin, Connelly, Goldberg, Hogan, Rooney, Sabbey, Carr, Johnson, Aiello, Skerry, Kunian, Vernaglia, and Owens**

70. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 69, as though fully set forth herein.

71. The liability of the defendant law firm for discriminating against plaintiff arises in whole or in part from each individual partner's own negligence, wrongful acts, errors, or omissions. Thus, through the above-described conduct, each of the partners is jointly and severally liable to plaintiff under M.G.L. c. 108A, § 15(3) for the damage caused by the law firm's discriminatory decision to deny her partnership.

72. As a result of the individual defendants' unlawful conduct, plaintiff has suffered economic damages and emotional distress.

**WHEREFORE,** plaintiff requests this Court to:

1. Award her compensatory damages, damages for emotional distress, damages for harm to reputation, punitive damages and attorneys' fees and costs.

2. Award her such other relief as the Court deems just and proper.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

Plaintiff Andrea C. Dow,
By her attorney,

Jody L. Newman (BBO # 542264)
Jill R. Gaulding (BBO # 645278)
**Dwyer & Collora, LLP**
600 Atlantic Avenue
Boston, MA 02210-2211
(617) 371-1000

Dated: April 9, 2001